# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 12, 2014

## STATE OF TENNESSEE v. ATOSHA DOMINIQUE MOORE

**Direct Appeal from the Criminal Court for Davidson County**
**Nos. 2012-D-3219, 2012-D3245     Cheryl A. Blackburn, Judge**

---

**No. M2013-02662-CCA-R3-CD - Filed November 18, 2014**

---

The appellant, Atosha Dominique Moore, pled guilty in the Davidson County Criminal Court to two counts of aggravated robbery, and the trial court imposed a total effective sentence of ten years in the Tennessee Department of Correction. On appeal, he challenges the length of the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

James O. Martin, III (on appeal), and Stacey Angello (at trial), Nashville, Tennessee, for the appellant, Atosha Dominique Moore.

Robert E. Cooper, Jr., Attorney General & Reporter; Benjamin A. Ball, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Davidson County Grand Jury returned two separate indictments against the appellant, each charging him with a single count of aggravated robbery. On September 20,

2013, the appellant entered best interest guilty pleas to the charged offenses.[1] At the plea hearing, the State recited the following factual basis for the pleas:

> [In case number] 2012-D-3219, if that had gone to trial, the State's proof would be that July 8th, 2012, Ms. Gennyfer Coss[,] who is employed by Pizza Hut[,] got a call to make a delivery at 829 West Mc[K]ennie Avenue. When she showed up there, she was approached by some subjects who[,] instead of purchasing the pizza[,] displayed guns and demanded money. They took cash, the pizza, a cell phone, and fled the scene. The phone number that was used to order that pizza was tracked back to a lady named Woody Arondale (phonetic). Ms. Arondale said that the [appellant], Keith Woods, and Ronnie Woods had stopped by her residence where [the appellant] used her phone and then they left. Ms. Arondale claimed that she didn't know there was going to be a robbery, but she did identify the three people that stopped by her house and used her phone. [The appellant] was put in a photo lineup and identified by Ms. Coss. When he was interviewed, he admitted that he, Keith Woods, and Ronnie Woods had all participated in this robbery. This was here in Davidson County obviously.
>
> [In case number] 2012-D-3245, . . . the proof would be on September the 2nd of 2012 at the Pharmacy restaurant – or just outside the Pharmacy restaurant at 731 Mc[F]errin Avenue a Ms. Rachel Newton and her boyfriend Vincent Lokes (phonetic) were approached by a person who turned out to be the [appellant]. He pointed a gun at them and at Ms. Newton and demanded her money and her iPhone. He took her iPhone and $12 cash. They were able to trace the iPhone immediately when the officer got there to 1012 Apex Street. They surrounded that residence, they went in, they found the phone there. The police talked to [the appellant], who claimed that he had the phone, but he said that he had seen the two people[,] and the lady put her phone down on a wall[,] and he had picked up

---

[1] An accused who wishes to plead guilty yet assert his innocence may enter what is known as a "best interest" guilty plea. See North Carolina v. Alford, 400 U.S. 25, 37-38 (1970). A trial court may accept such a plea if the court is satisfied that there is a factual basis for the plea. See Dortch v. State, 705 S.W.2d 687, 689 (Tenn. Crim. App. 1985).

the phone and made off with it without there being any physical violence or threats or guns.  And that's in Davidson County as well.

The plea agreement provided that the trial court would determine the length of the sentences.

At the sentencing hearing, Gennyfer Coss testified that on July 8, 2012, she was an employee of Pizza Hut.  That night, it was raining, and Coss was making deliveries.  After 10:00 p.m., Coss delivered pizza and "hot wings" to West McKennie in east Nashville. When she arrived at her destination, she exited the car and went to the porch.  She heard a car door then saw the appellant; she assumed he got out of a car.  The appellant walked onto the porch and said, "[T]hat's for me."  The appellant began rummaging through his pockets, then he told her that he could not find his wallet.  Coss said that the appellant seemed nervous.  Coss told him that he could call the store if he found his wallet, then she stepped off the porch. Another man, Keith Woods, came from an alley beside the house.  Coss walked toward her car, and Keith Woods walked up to her, pointed a gun in her face, and said, "[G]ive me your money."  She took her money from her back pocket and handed it to the man.  He also took the bag of pizzas from her.  A man came up behind her; although she did not see his face, she assumed it was the appellant.  He pointed a gun to the back of her head.  Coss began to cry and begged, "[P]lease, don't do this because I have children at home."  Keith Woods said "foul things" and told her to be quiet.  Thereafter, Keith Woods asked her for the location of her cellular telephone.  She responded that the telephone was in her car.  The men walked her over to her car.  She began to fear "that even if they don't mean to kill me they might accidentally pull the trigger while we were walking."  Her knees got weak, and the man she thought was the appellant "sort of carried" her and pushed her into her car.  Once inside, she handed Keith Woods her cellular telephone.  He saw her purse on the front seat and demanded all of the money in the purse.  She pulled out the pockets of the purse to show him that there was no money inside, but he kept demanding, "[G]ive me your money."  Coss handed Keith Woods the purse and gave him the change that she kept in the ashtray in her car.  Keith Woods warned her, "[D]on't ever be seen in the neighborhood again."  After the men left, Coss drove away to a nearby Shell station and called the police.

Coss said that after the offense, she quit her job because she was afraid to deliver pizzas, insufficient hours were available for her to work in the store as a cashier, and she was afraid to work the night shift.  She had not been able to find a job making as much money as she had at Pizza Hut.  She continued to refuse to work at night.

Coss said that until recently, she had lived in the same neighborhood where the offense happened.  She had five children, three of whom lived at home.  For approximately one year, the offense "had a major psychological and emotional effect" on Coss and her

-3-

children. She said that she did not explicitly tell her children about the incident but that they noticed her fear. Even after her assailants were arrested, she feared what they might do to prevent her from testifying. Coss underwent counseling and had improved.

Bettie Hoard, the appellant's great aunt, testified that the appellant had two brothers. His mother was "not settled" and was "from pillar to post." His mother decided that her sons "were unruly" and that "she did not want to be bothered anymore." Hoard and the appellant's aunt, who was his mother's sister, tried to help with the boys. However, whenever the boys experienced some stability, their mother would return and take them away. Eventually, in order to receive child support payments from the boys' mother, the boys' father offered to raise the children. The boys' father mistreated them and did not supply sufficient clothes or food. Thereafter, the appellant went to live with one of Hoard's daughters, "which was still not a good situation. The abuse was still coming from the – he was always looking for food, always asking." The appellant expressed a desire to enter the Job Corps, and Hoard helped him achieve that goal. She said that "during the process some things happened there, and he wound up coming back home." He went from his aunt's house to Hoard's daughter's house. Hoard's daughter "would just get mad and talk ugly to him, put him out, wouldn't let him eat, you know, just wouldn't do anything for him." The appellant's aunt asked the appellant to follow the rules of her house, but he was unable to comply. The appellant's mother "just got mad one day and got a U-Haul truck, packed up everything in the house, and left." No one knew where she went.

Hoard said that if the appellant had come to her after he left Job Corps, "he wouldn't have gotten involved in this." However, she had previously told him, "[I]f you fail out of the Job Corps, you know, don't call me because I'm not going to help." She said that she "really didn't mean it to heart" but that the appellant thought she meant what she said.

The appellant, who was eighteen years old at the time of the offenses, testified that his childhood was difficult, especially because his mother was gone and he had to travel from house to house to find food. He said that he had been an angry person. He acknowledged that Hoard loved him but said that "it hurt trying to wake up every day and you don't know where your mama is. I mean, you only got one mama." He noted that it was "hard . . . when you're in a predicament and you really ain't got no help."

The appellant said that he had been incarcerated since September. During his incarceration, the appellant was baptized and obtained a high school diploma. He said that he "gave [his] life to Christ" and was trying to stay away from "negativity" in order to change his life. He asserted that he had matured while incarcerated. The appellant apologized, stating that he was not an evil person. He said, "I thank God that I experienced this because this is a wake up call."

-4-

On cross-examination, the appellant said that during Coss's testimony, he was thinking "[t]hat I hurt a woman that's a mother of kids. And . . . that was her job, and she liked it. She had to put food on her kids' table to feed them and take care of her utilities. And I apologize for it." The appellant acknowledged that he was the man who came up behind Coss, that Keith Woods was the other man, and that Ronnie Woods acted as a lookout. Further, the appellant was the person who called to order the pizza. He asserted that he was willing to testify truthfully against Keith Woods. He acknowledged that in the other case, which involved Newton and Lokes, he lied to the police when he said "that the lady had put the phone down on a wall . . . and [he] picked the phone up." He admitted that he robbed Newton and that he used a real gun to accomplish the robbery. In 2009, the appellant was adjudicated delinquent on charges of aggravated burglary and theft. He was put on probation in juvenile court and performed well on probation.

The court asked the appellant how his "horrible childhood" made it "okay to do that to [the victim]." The appellant responded that "[i]t really wasn't okay at all" and that he did it for the money. At that point, the following colloquy occurred:

> [Trial Court:] Just for the money. It was simply for the money, it didn't matter. So why add the extra putting the – you know, you could have – she gave you the money she had at the house?
>
> [The appellant:] Yes, ma'am.
>
> [Trial Court:] So what was the point of terrifying her so much by putting the gun to her head and then I believe in the other case saying don't make two murders out of this? What was the point of adding that if all you needed was the money? Do you see my question?
>
> [The appellant:] Yes, ma'am.
>
> [Trial Court:] Do you know an answer to that?
>
> [The appellant:] No, ma'am.

The court explicitly considered the purposes and principles of sentencing and the facts and circumstances of the offenses. The court noted that as a Range I, standard offender, the appellant was subject to a sentence of eight to twelve years for each Class B felony conviction. Tenn. Code Ann. §§ 39-13-402(b); 40-35-112(a)(2). The court observed that

the appellant acknowledged in his presentence report that he had a history of alcohol and drug use, which constituted criminal behavior. Tenn. Code Ann. § 40-35-114(1). Additionally, the appellant had juvenile adjudications that would have been felonies if committed by an adult. Tenn. Code Ann. § 40-35-114(16). The court further found that in the conviction involving Coss, the appellant was a leader in the commission of the offense. Tenn. Code Ann. § 40-35-114(2). Finally, the court found that the appellant treated or allowed Coss to be treated with exceptional cruelty. Tenn. Code Ann. § 40-35-114(5). The court explained:

> [T]he case law is pretty clear that it must reflect cruelty over and above what is inherent in the execution [of] the crime. So one can commit aggravated robbery by pulling a weapon on somebody, taking their money, and walking away or letting them walk away. That's not what happened here. And I think the emotion that was shown by Ms. Coss and her description and the terror that she felt in terms of they put the gun to her forehead was the first one. That would be Mr. Woods. And then as they walked her back to the car, demanding her money out of her car and her cell phone, he puts the gun to the back of her head. And she is so terrified that he has to practically carry her down there or hold her as she's going and then her begging them. And her words were – because they were demanding about giving the money and the purse. Then they tell her to never come back again. All of that to me indicates factor number five has been made out in both cases.

The court found that the appellant's telling the truth about the offenses, his behavior while in custody, and his remorse were mitigating factors. Tenn. Code Ann. § 40-35-113(13). The court stated, however, that the appellant's showing of remorse was "a little late in terms of what it was." The court ultimately imposed a sentence of ten years for each conviction and ordered that the sentences be served concurrently. The court said that the appellant was statutorily ineligible for probation because of the aggravated robbery convictions.

On appeal, the appellant contends that "an eight year sentence in this case is more consistent with the principles of Tennessee's sentencing structure and his sentence should be so modified."

## II. Analysis

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id.

at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant does not contend that the trial court erred by applying any of the enhancement factors, and we conclude that the factors were not improperly applied. He does, however, contend that "taking into consideration both his tremendously challenging childhood and the strides he made by taking advantage of his time in jail prior to the sentencing hearing (completing his high school education, etc.) that justice, in this case, would be a sentence of eight years rather than ten."

The record reveals that the trial court considered the appellant's difficult childhood but rejected it as a mitigating factor, finding that it did not justify the appellant's behavior. The trial court also considered the appellant's behavior while incarcerated. Accordingly, the appellant's true complaint concerns the weight the trial court attributed to the enhancing and mitigating factors. As this court has repeatedly cautioned, however, "[m]ere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence." State v. Banks, 271 S.W.3d 90, 146 (Tenn. 2008) (citing Carter, 254 S.W.3d at 345-46).

### III.  Conclusion

We conclude that the trial court did not err in sentencing the appellant. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE